IN THE UNITED STATES DISTRICT COURT
FOR THE STATE OF DELAWARE

| | |
|---|---|
| **IVIN CORNELIOUS**<br>728 Tamarack Drive<br>Fayetteville, NC.<br><br>       Plaintiff,<br>vs.<br><br>**DETECTIVES MACNAMARA, PHELPS, JAMES WIGGINS and UNKNOWN OFFICERS**<br>McLaughlin Public Safety Building<br>300 N. Walnut Street<br>Wilmington, Delaware 19801<br><br>and<br><br>**THE CITY OF WILMINGTON, DELAWARE**<br>Louis L. Redding City/County Building<br>800 North French Street<br>Wilmington, Delaware 19801<br><br>Defendants | CIVIL ACTION NO.<br><br>**23-659-**<br><br>District Judge<br><br>COMPLAINT FOR VIOLATIONS OF THE 4TH AMENDMENT OF THE CONSTITUTION OF THE UNITED STATES, SECTION 1983 OF THE CIVIL RIGHTS ACT, FALSE IMPRISONMENT, MALICIOUS PROSECUTION, FAILURE TO TRAIN AND SUPERVISE UNDER MONELL, INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS |

Plaintiff, Ivin Cornelious, by way of Complaint against defendants says:

## PARTIES

1. Plaintiff, Ivin Cornelious, is an adult individual and citizen of the State of North Carolina, residing in Fayetteville.

2. Defendant, City of Wilmington, was and still is a domestic municipal corporation duly organized and existing under and by virtue of the laws of the State of Delaware, with a principal place of business located at 800 North French Street, Wilmington, Delaware 19801.

3. Defendants, Detectives Macnamara, Phelps, Wiggins and Unknown Officers, were at all times relevant employees of the defendant, City of Wilmington. At all times herein mentioned, defendants Macnamara, Phelps, Wiggins and Unknown Officers, were acting under the color of law and their individual capacity as police officers of the defendant, City of Wilmington.

## JURISDICTION AND VENUE

4. The Court has jurisdiction over the lawsuit because the action arises under the Laws and Constitution of the United States, in particular, the Fourth Amendment and 42 U.S.C.A. § 1983.

5. Plaintiff was deprived of his rights secured to him under the Constitution and the laws of the United States including, but not limited to, his right to be secure in his person and property and be free from malicious prosecutions, and freedom from imprisonments when no probable cause exists.

6. Plaintiff, was falsely charged without probable cause and was falsely and maliciously imprisoned and prosecuted without any cause or legal justification.

7. The Court has supplemental jurisdiction under 28 U.S.C § 1367 over plaintiff's claims arising under State law, including but not limited to violations of his State rights against defendants for false imprisonment, malicious prosecution, and intentional infliction of emotional distress because these claims are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article 3 of the United States Constitution.

8. Venue is proper in this Court pursuant to 28 U.S.C. §1391, as the claims at issue arose in this judicial district.

## COMPLAINT
## GENERAL ALLEGATIONS

9. The above paragraphs are repeated and incorporated herein by reference as if set forth in full.

10. On or about August 14, 2019, plaintiff was driving his lawfully rented Chevrolet motor vehicle in Wilmington, Delaware when he was "pulled over" by the defendants in a Wilmington Police operation called "Operation Safe Streets" for failure to use a turn signal.

11. After plaintiff pulled over his vehicle, defendant Wiggins approached plaintiff's car and asked plaintiff to produce his driver's license, vehicle registration and insurance.

12. Plaintiff then gave Wiggins his driver's license and a valid car rental contract for the vehicle.

13. Defendant Wiggins then ordered plaintiff "out of the car" and then proceeded to search plaintiff by "pat-down" for possession of weapons. No weapons were recovered on plaintiff's person by the defendants.

14. Defendant Wiggins then ordered plaintiff to the back of plaintiff's vehicle and then further ordered Defendants Macnamara and Unknown Officers to search plaintiff's without any probable cause to conduct the search.

15. After their search was completed, defendants did not retrieve any contraband from inside plaintiff's vehicle.

16. Then, moments after the search of plaintiff's vehicle was completed, an unknown defendant officer entered plaintiff's vehicle and drove it away.

17. Plaintiff was then arrested and charged with Illegal Possession of a Firearm and Failure to Signal when making a left turn.

18. Bail against the plaintiff was set at $33,000.00.

19. Plaintiff spent two days in New Castle County Jail when then spent $2,500.00 to pay a bail bond service.

20. Plaintiff was put on pre-trial probation which did not allow him to leave the State of Delaware which prevented him from seeing his children in the State of New Jersey.

21. Plaintiff had to pay over $5,000.00 in private attorney legal fees.

22. At no time were the defendants able to produce the "so-called" illegal weapon possessed by plaintiff and allegedly recovered by the defendants after their vehicle search on August 14, 2019.

23. On June 16, 2021, all charges were dismissed against the plaintiff by the Superior Court of New Castle County

## COUNT I
## PLAINTIFF IVIN CORNELIOUS VS. DETECTIVES MACNAMARA, WIGGINS, PHELPS AND UNKNOWN OFFICERS
## THE RIGHT OF PEOPLE TO BE SECURE IN THEIR PERSONS UNDER THE 4th AMENDMENT OF THE UNITED STATES CONSTITUTION
## FALSE IMPRISONMENT AND MALICIOUS PROSECUTION UNDER SECTION 1983, OF THE CIVIL RIGHTS ACT

24. The allegations contained above are incorporated herein as though fully set forth.

25. The above described actions of defendants' on August 14, 2019, constitute violations of plaintiff's constitutionally protected right to be secure in his person as provided by the 4th Amendment of the United States Constitution.

26. The arrest and detention of plaintiff, by defendants were carried out unlawfully, intentionally and maliciously, without just or probable cause, for the express purpose of trying to justify the illegal arrest, false imprisonment and malicious prosecution of plaintiff.

27. The arrest and detention of plaintiff by defendants violated his rights under the United States Constitution and the Laws of the State of Delaware.

28. The actions of defendants as police officers were committed under color of law and authority of defendant City of Wilmington and its police department, and while acting in their individual capacity as police officers.

29. The actions or inactions of the defendant police officers recklessly disregarded and therefore deprived plaintiff of his rights under the Laws and Constitution of the United States, in particular, the Fourth Amendment and 42 U.S.C.A. § 1983, including but not limited to the right to be secure in this person, to be free from unlawful seizures, arrests and malicious prosecution.

## COUNT II
### PLAINTIFF IVIN CORNELIOUS VS. THE CITY OF WILMINGTON, DELAWARE FAILURE TO TRAIN, SUPERVISE AND DISCIPLINE DEFENDANT DETECTIVES MACNAMARA, WIGGINS AND UNKNOWN OFFICERS UNDER SECTION 1983, OF THE CIVIL RIGHTS ACT AND "MONELL"

30. The foregoing paragraphs are incorporated in this Count but will not be restated for the sake of brevity.

31. Defendant, City of Wilmington and its police department, as a matter of policy and practice failed to discipline, train, supervise or otherwise sanction police officers Macnamara, Wiggins and Unknown Officer who have violated the rights of citizens by unlawfully arresting and maliciously prosecuting dozens of citizens, including the plaintiff's, in the failed police operation "Operation Safe Streets" thus encouraging defendants in this case to falsely arrest citizens of the City of Wilmington.

32. The Wilmington Police Department's Operation Safe Streets (OSS), a partnership between police officers and probation officers for patrolling people on probation. Local police officers assigned to the OSS unit would pair up with Delaware Department of Correction (DOC) probation officers to check on people to

make sure that they were following the rules of their probation. That could include curfew checks, traffic stops, and home inspections.

33. Using an aggressive formula, police officers provide the muscle while probation officers conduct warrantless searches. By design, OSS officers would not only squeeze people on probation, they'd also get leads on other potential crimes. Together, their power became nearly limitless, as did the scope of their mandate.

34. The ACLU of Delaware reviewed 16 court cases involving the OSS/GTF programs; these included six home searches, five stops for traffic violations, two interactions in a parked car, and four stops while the person was on foot hanging out with friends or simply walking. In all but three of those cases, the courts found that OSS/GTF's conduct was unlawful.

35. In 2019 and 2020, 57 of the 60 random vehicle stops made by OSS for traffic violations that resulted in a criminal arrest involved a Black driver. Two others involved a Hispanic person and a white driver with a Black passenger. The race of the driver in the last case was redacted, but the person arrested was Black.

36. In April 2020, Shawn Mitchell was driving in East Wilmington with his sister and his brother in a car that a friend had rented for him. None of them were on probation. Mitchell turned left from North 10th Street onto North Spruce Street, and soon after two men driving an unmarked car turned on their siren and pulled him over.

37. Corporal Rich Evans and Senior Probation Officer Daniel Collins, both with Operation Safe Streets, approached and told Mitchell they'd pulled him over because he hadn't used his left turn signal. As they were talking, Mitchell watched another patrol car speed recklessly the wrong direction down a one-way street toward him as if a large bust was in process.

38. Evans and Collins looked over Mitchell's rental agreement and told him he wasn't authorized to drive the car because his name wasn't on the agreement. Mitchell said that he told the officers his friend rented the car for him because his truck had broken down and he didn't have a credit card to pay for Enterprise's deposit. The OSS officers asked all three to step out of the car. Mitchell said they proceeded to search it without asking. Then, they handcuffed Mitchell and his sister, Bilneshia Brown.

39. The officers refused to tell them why they were being arrested. Once at the police station, the officers told Mitchell that they had brought him there because they found 18.3 grams of cocaine in the car's sun visor. They also confiscated $510 from Mitchell's pocket as purported evidence that he was dealing drugs.

40. In interviews, Mitchell and Brown maintained that the drugs didn't belong to them. Prosecutors agreed that the evidence didn't add up.

41. Jeffrey Rose's run-in with OSS was similar.

42. At around 10 pm on November 8, 2019, Rose drove to Wilmington's Southbridge neighborhood to pick up a female friend for a party they were going to in Baltimore. Rose, who is Black and was not on probation, was driving a black Chrysler 300 that he had purchased two weeks earlier.

43. While stopped at a light near his friend's home, he noticed a black Chevy Tahoe next to him. Eventually, he parked near his friend's house on B Street, a quiet block on the easternmost outskirts of Wilmington lined with a Baptist church, a park, a community center, and a string of modest houses.

44. Soon, Rose saw the Tahoe driving by again. Rose's friend climbed into the car, and he handed her a pill bottle filled with Ecstasy and Xanax. Within seconds, the driver of the Tahoe pulled up behind Rose while another driver in a gray car pulled in front to trap him from driving away.

45. Rose, who had no idea who was in either car, feared that whoever it was wanted to hurt him. He hopped out of the car with his hands in the air. Rose saw three police officers wearing vests and radios heading toward him. Two of the officers had their guns drawn. They were officers with OSS.

46. Immediately, two of the officers opened the passenger side door and removed Rose's friend from the car. They started searching it and found the pill bottle of drugs. "Why did you get out of the car for?" asked the third officer, then-Sergeant Matthew Rosaio, according to a court filing. "I thought something else was going on," Rose replied.

47. One officer took Rose's driver's license from his pocket then marched him over to the Tahoe, where he was handcuffed. By that time, Rose estimated that there were six OSS officers on the scene surrounding his car. It didn't take long for them to tell him that they'd found his book bag containing Ecstasy and that they had a family court capias warrant—a court order to detain someone to ensure that they'll appear in court. Later,

48. Rosaio and WPD Detective James Wiggins, who was in the passenger seat of the Tahoe, would testify that they were driving around Southbridge with Probation Officer Justin Phelps looking for "anything of a criminal nature or that would be suspicious."

49. In Wiggins telling, Rosaio was slowly driving down B street with the windows open when he and Wiggins began to smell marijuana. To pinpoint the origin of the smell, Rosaio circled the block again. He deduced that it came from the black Chrysler with Rose inside. Rosaio said that once they pulled in front, Rose volunteered that he had been smoking marijuana, had a capias, and had a book bag containing Ecstasy. In fact, there was no evidence that Rose had smoked marijuana, and he claimed that not only had he not smoked that day, he would never smoke inside his new car because doing so would damage the interior. Further demonstrating that officers had used the scent of marijuana as a pretense for searching his vehicle,

50. Rose said that no one even asked him about marijuana until after he was in custody and an officer had discovered his medical marijuana card. On January 6, 2020, a grand jury indicted Rose for drug dealing and aggravated possession. He bonded out soon after. His lawyer, Tom Foley, argued that OSS officers had illegally stopped and searched Rose, and he filed a motion to throw out the evidence that led to Rose's arrest. In June 2022, Superior Court Judge Abigail LeGrow agreed, issuing an order to suppress the evidence. Months later, prosecutors agreed to drop the charges.

51. In November 2020, they dropped the charges against Mitchell and Brown, citing a lack of evidence. Mitchell claimed that the OSS officers have still not returned his money.

52. OSS officers are encouraged to extort people on probation so that they can make more collateral arrests.

53. A 2004 impact report on OSS/GTF submitted by the Delaware Sentencing Research and Evaluation Committee described how that works. "[T]eams may stop suspicious persons for questioning and will try to solicit information from the persons they question about illegal activities that are going on in the general area," the report reads. "In many cases the individual questioned is on probation, which affords the OSS-GTF teams more leverage." The report's authors openly state that arrests are a goal of OSS/GTF, noting that "collateral investigative activity" generates "many more arrests than curfew checks do."

54. Defendants, City of Wilmington and its police department as a further matter of policy and practice failed to train properly its police officers Macnamara, Wiggins, Phelps and

Unknown Officers, with respect to the constitutional, statutory and departmental limits of their authority including refraining from illegal arrests of citizens of the City of Wilmington.

55. The defendant, City of Wilmington and its Police Department were on actual notice of a need to train, supervise, discipline or terminate defendant officers Macnamara, Wiggins, Phelps and other unknown officers, prior to the incident in question, as other similar incidents of Operation Safe Streets illegal arrests of citizens have occurred in the past involving defendants.

## COUNT III
## PLAINTIFF IVIN CORNELIOUS VS. DETECTIVES MACNAMARA, WIGGINS, PHELPS AND UNKNOWN OFFICERS
## MALICIOUS PROSECUTION

56. The foregoing paragraphs are incorporated in this Count but will not be restated for the sake of brevity.

57. The defendants had no probable cause to arrest and initiate the criminal charges against the plaintiff.

58. The defendants acted maliciously when they manufactured false evidence against the plaintiff and knowingly used that evidence along with perjured testimony in an attempt to secure a wrongful criminal conviction against the plaintiff.

59. The actions of defendants amount to a malicious prosecution under both 28 U.S.C. section 1983 and the common law.

## COUNT IV
## PLAINTIFF IVIN CORNELIOUS VS. DETECTIVES MACNAMARA, WIGGINS, PHELPS AND UNKNOWN OFFICERS
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

60. The allegations contained above are incorporated herein as though fully set forth.

61. The above described illegal detention and arrest of the plaintiff constitutes an assault and battery by defendants as a result of which plaintiff was injured and sustained severe and significant emotional distress, including but not limited to, loss of sleep, loss of appetite, depression, inability to perform daily activities of work and life.

### PLAINTIFF IVIN CORNELIOUS VS. DETECTIVES MACNAMARA, WIGGINS, PHELPS, UNKNOWN OFFICERS AND THE CITY OF WILMINGTON
### DAMAGES

62. The above paragraphs are repeated and incorporated herein by reference as if set forth in full.

63. As a direct and proximate result of the defendants' conduct, plaintiff suffered physical pain and suffering in the past and future, severe mental anguish in the past and future and was deprived of his Constitutional Rights as aforementioned, and as such will suffer economic damages and was otherwise damaged.

64. The plaintiff has suffered and will suffer in the future from permanent residuals.

### ATTORNEY FEES

65. It was necessary for plaintiff to hire the undersigned attorney to file this lawsuit. Upon judgment, plaintiff is entitled to an award of attorney fees and costs under 42 U.S.C. § 1988 (b).

### PRAYER

66. The above paragraphs are repeated and incorporate herein by reference as if set forth in full.

67. Plaintiff demands judgment against defendants Macnamara, Wiggins, Phelps and Unknown Officers individually, jointly and/or in the alternative for: compensatory

damages, punitive damages, attorney fees, interest and costs of suit and such relief as the Court may deem just and equitable.

68. Plaintiff demands judgment against defendant, City of Wilmington, jointly and/or in the alternative for: compensatory damages, attorney fees, interest and costs of suit and such relief as the Court may deem just and equitable.

## PLAINTIFF'S DEMAND FOR JURY TRIAL

69. Plaintiff asserts his rights under the Seventh Amendment to the U.S. Constitution and demands, in accordance with the Federal Rule 38, a trial by jury on all issues.

Respectfully submitted,

Ivin Cornelious, Plaintiff